**SABRINA P. SHROFF**                                       233 BROADWAY
ATTORNEY AT LAW                                 NEW YORK, NEW YORK 10007
                                                                                                 TELEPHONE: (646) 763-1490

                                                           August 20, 2020

**BY ECF**

Honorable Denise L. Cote
United States District Judge for the
 Southern District of New York
500 Pearl Street, Courtroom 18B
New York, NY 10007-1312

**Re: United States v. Vasquez-Drew, 19 Cr. 91 (DLC)**
    (Sentencing Letter of Percy Arturo Vasquez-Drew)

Dear Judge Cote:

      I write on behalf of my client Percy Arturo Vasquez-Drew, who has pled guilty to one count of Conspiracy to Import Cocaine into the United States. For the many reasons set forth below, Mr. Vasquez-Drew respectfully requests that the Court impose the 60 month sentence recommended by the United States Department of Probation. As noted by the Department of Probation, this requested sentence properly takes into account the seriousness of Mr. Vasquez-Drew's criminal conduct and meets the goals of sentencing, while also recognizing Mr. Vasquez-Drew's familial responsibilities; his lack of a prior criminal history; the unusually difficult conditions of his confinement; that he has not a single disciplinary infraction and worked all through his time in jail; and his sincere remorse for what he has done and attendant commitment to never reoffend. After serving his sentence, Mr. Vasquez-Drew, who is a Bolivian citizen and has never resided in the United States, will be deported back to Bolivia. He has a long road ahead of him – Bolivia's borders remain closed, and the wait in ICE custody will be lengthy.

      Mr. Vasquez-Drew is 41 years old and, prior to the conduct at issue, spent many years trading livestock in Bolivia to support his elderly and ailing mother, his three children, and the many other members of his close-knit family.  Bolivia is an extremely poor country and has one of the highest poverty rates in South America (approximately 39% percent of Bolivians live in poverty), and nearly two-thirds (63%) of households in Bolivia do not earn enough money to afford sufficient amounts of food, leading to the highest level of undernourishment in South America.[1] As his family grew and their needs became greater, Mr. Vasquez-Drew felt tremendous pressure to support his family. In that desperation, he made the decision to accept the offer from the confidential source and become involved in the cocaine trafficking deal that is the crux of this indictment and which led to his arrest and extradition to the United States. He has long regretted that decision.

      Mr. Vasquez-Drew accepts responsibility for the choice he made and the actions he took. He had no intent to harm the United States but has seen the harm and suffering his actions bring

---

[1] "Top 10 Facts about Hunger in Bolivia," available at https://borgenproject.org/tag/poverty-in-bolivia (Sept. 22, 2018), last accessed August 11, 2020. The Borgen Project is a non-partisan, non-profit organization dedicated to fighting extreme poverty by advancing policies and programs that seek to improve living conditions for those living on less than $1 per day. See https://borgenproject.org/about-us/, last accessed August 13, 2020.

Honorable Denise L. Cote                                                                                           August 20, 2020
Judge, United States District Court                                                                                        Page 2

to addicts, their families and society as a whole. As importantly he has heard and listened to the harm he brought to the ones he loves, and is committed to returning to Bolivia and leading a law-abiding life. While he should face appropriate consequences for what he did, a sentence within the guidelines range in this case (135-168 months in prison) is too harsh, contradicting the parsimony principle guiding federal sentencing for at least two reasons.

*First*, the guidelines range is based on a base offense level predicated on Mr. Vasquez-Drew "being held responsible for distributing 450 kilograms and more of cocaine" Pre-Sentence Report ("PSR") ¶ 19; *accord id.* ¶ 26. In turn, this amount is based on statements and promises by Mr. Vasquez-Drew, the conspirators and others that they could ship 1,500 kilograms in an order right away, and as much as 3,000 kilograms an order in the future. The facts, however, demonstrate that the statements were not at all indicative of ability. It was puffery and braggadocio. Indeed, when it came down to it, the co-conspirators in this conspiracy struggled even to produce and transport ten kilos of cocaine from Bolivia to Florida – much less the fictional larger quantities so airily promised.

*Second*, the guidelines range is neither mandatory nor presumptively reasonable. Rather, it is purely advisory, and but one of several equally important sentencing factors for the Court to consider in arriving at an appropriate sentence. Here, as the Department of Probation recognized, all the other 18 U.S.C. § 3533(a) sentencing factors support a 60-month sentence for Mr. Vasquez-Drew.

For these two reasons, and the others set forth herein, Mr. Vasquez-Drew respectfully submits that the Court should sentence him to 60 months in prison, to be followed by his deportation to Bolivia. This requested sentence, which is also the Department of Probation's recommended sentence, is a sufficient sentence here.

## Background

**Percy Arturo Vasquez-Drew**

Percy Arturo Vasquez-Drew is a Bolivian citizen who has resided most of his life in Bolivia. He and his older brother, Richard Drew, were raised in Reyes, Bolivia by their step-father, Victor Vasquez Salinas, and his mother, Isabel Drew. He has never known his biological father. Percy grew up happy but extremely poor, with his family often lacking food and other basic necessities. PSR ¶¶ 43-44. He stayed in school, earned his high school diploma, and then took computer courses, earning a certificate from a technical school. *Id.* ¶¶ 56-57.

Unable to find a job that utilized his computer skills, Mr. Vasquez-Drew began buying, selling, and trading livestock in Bolivia, a job requiring long hours and travel throughout Bolivia. PSR ¶¶ 47, 58. He worked hard; really, he had no choice. As his parents aged, and he and his brother started families of their own, Mr. Vasquez-Drew became the emotional and financial center for his entire extended family – including his children, his brother's family, his aunts and uncles, and his mother. *Id.* ¶ 43; *see also* Family Letters of Support, Exhibit A.[2] Whatever they needed – medical care, rent payments, food, help with education, or just someone to listen and help – Mr. Vasquez-Drew made sure to be there. *Id.* He was always in touch, calling his mother

---
[2] Only the English translations of the letters of support are attached. The letters were written in Spanish, translated by Court certified interpreter Alex Weider. The Spanish version is available for the Court's inspection.

Honorable Denise L. Cote  August 20, 2020
Judge, United States District Court  Page 3

every day, and the rest of his family weekly, to make sure everything was okay. *Id.* As his cousin, Franz Vasquez, relates: "he [Mr. Vasquez-Drew] always helped us with anything that was within in his abilities." Franz Vasquez Letter (Ex. A). United States Probation Officer Tandis spoke directly with Mr. Vasquez-Drew's uncle who was told of how he cared for his mother after her stroke 6 years ago, and hired a nurse to care for her.[3] ¶ 43. Acutely aware of his obligations to the single mother that raised him, Mr. Vasquez Drew cared for her as she could no longer wash or care for herself.

Mr. Vasquez-Drew has three children, Leyla, age 15, Julio, age 11 and Damian, age 4. While his relationships with their mothers have ended,[4] he always made sure his children were taken care of – financially supporting them, spending time with them, and helping to raise them. PSR ¶ 45. His brother Richard, a taxi driver in Reyes, has limited financial resources, so Mr. Vasquez-Drew helps support Richard's family too. *Id.* ¶ 43. His step-father, Victor, died in 2008 from a heart condition and his mother, Isabel, now in her 80s, is ill and in poor health. *Id.* ¶¶ 43-44. About six years ago, Isabel suffered a massive stroke that left her disabled, unable to speak, and no longer able to take care of herself. She is also nearly blind. Mr. Vasquez-Drew hired a nurse to take care of his mother and otherwise supported her financially and medically. *Id.* ¶ 43; *see also* Letter from Uncle Percy Vasquez (Ex. A) (relating how Mr. Vasquez-Drew has supported him in the past and paid for Isabel's medical expenses after her stroke). Since Mr. Vasquez-Drew's arrest and pre-trial incarceration, however, the family can no longer afford to pay for a nurse or other support for his mother, and, without Mr. Vasquez-Drew's financial help, all of them are struggling to make ends meet. *Id.*

Mr. Vasquez-Drew's arrest has devastated his family financially and emotionally. Mr. Vasquez-Drew has long been the center of his extended family. His cousin, Yaritza Vasquez, explains how much they miss him, and why, informing the Court: "I can only say good things about Percy, he is a person with a noble heart, [always] very mindful about the entire family, attentive and very hard working." Yaritza Vasquez Letter (Ex. A) at 1. She continues:

> I beg you with all my heart to have mercy of my cousin Percy and all his family, his children and his mother need him very much. His mother is ill, she was left with the consequences of a stroke and he used to take care of her financially, of her medicines and also was with her during festive moments.
>
> All in the family will be eternally thankful to you, Judge, if you give Percy a second chance,

*Id.* at 2.

Of course, Percy's absence has been most keenly felt by his children and his mother. Franz Vasquez tells how dearly Julio, Mr. Vasquez-Drew's 11-year-old son, misses his father. Franz Vasquez Letter (Ex. A). And, the family was too afraid even to tell his mother, Isabel,

---

[3] USPO Tandis spoke with Mr. Vasquez Drew's family members in Bolivia, with the assistance of court certified interpreter, Alex Weider.

[4] His wife cheated on Mr. Vasquez-Drew with his cousin. That betrayal had a profound and hurtful impact on him. Yet, for the sake of his children, he maintains a cordial relationship with his ex-wife.

Honorable Denise L. Cote                                              August 20, 2020
Judge, United States District Court                                            Page 4

about Percy's arrest and current situation, because they believe the shock and emotional pain might kill her. Letter from Uncle Percy Vasquez (Ex. A); PSR ¶ 46. The entire family "has remained supportive of Vasquez-Drew during his legal proceedings" and await his return to Bolivia. *Id.* Once there, the strong support of his family will, in turn, help him lead a law-abiding life.

### **The Offense Conduct**

Mr. Vasquez-Drew is being held responsible for distributing 450 kilograms or more of cocaine, of which ten kilos were delivered. PSR ¶ 19. Specifically, in June 2017, Mr. Vasquez-Drew met multiple times with three confidential sources. *Id.* ¶ 14. At those meetings, he told the confidential sources that he had contacts with a cocaine laboratory in Bolivia, and he could make an introduction that would allow the confidential sources to meet with an individual who could manufacture and transport thousands of kilograms of cocaine out of Bolivia and into the United States. *Id.* ¶¶ 14-15. Mr. Vasquez-Drew claimed he could readily supply "at least 1,500 kilograms of cocaine at a time, with future plans to send as much as 3,000 kilograms in an order." *Id.* ¶ 18. Subsequent events, however, show that the reality was far different than the story Mr. Vasquez-Drew painted at those meetings.

To, among other things, test what Mr. Vasquez-Drew had told them, the confidential sources made what should have been a simple request -- rather than thousands of kilos, all Mr. Vasquez-Drew had to do was to produce and deliver five kilograms of cocaine. PSR ¶ 14. That is when the wheels came off.

Mr. Vasquez-Drew introduced the confidential sources to his co-conspirators (including the person who supposedly had access to the cocaine laboratory from which thousands of kilos would allegedly flow). The confidential sources sent the money for the drugs directly to the co-conspirator and then the conspiracy started to put together the requisite five kilos. When ready, they showed the confidential sources a five kilo package of cocaine. PSR ¶¶ 15-16. That was the package that was to be shipped. However, that package never left Bolivia and was never delivered as promised, because "it was purportedly stolen by either corrupt airport officials in Bolivia or other drug traffickers." *Id.* ¶ 16.[5] Notably, this supposed theft happened despite Mr. Vasquez-Drew's and his co-conspirator's prior assurances and promises that he and his co-conspirator had a secure transportation system, featuring control of both military and commercial aircraft, which supposedly could easily smuggle thousands of kilos at a time out of Bolivia. *Id.* ¶ 14.

When the five kilos were lost, Mr. Vasquez-Drew and his co-conspirator were held responsible. They were told that it was their responsibility to make up for the lost five kilo sample as the co-conspirator had been paid for it, and they would be killed if they failed to correct matters. Neither Mr. Vasquez-Drew nor his co-conspirator had the money to pay off the cost of the lost five kilos, but still had to find a way to make up for the loss. Scared to death by the threats they were receiving, the co-conspirator sold his home in an attempt to pay off the debt created by the lost drugs. Mr. Vasquez-Drew had nothing to sell. For him, the only way to pay off

---

[5] The five kilos were stolen by two attorneys who Mr. Vasquez-Drew boasted he knew well and could be trusted and were the ones that had agreed to provide safe passage for the drugs.

the loss was to agree to another deal. Both agreed to remain in the conspiracy and promised to provide ten kilos to the confidential sources, to up for the lost drugs.[6]

Notably, to even be able to produce and deliver just these ten kilos to the confidential sources, the conspiracy had to add new members to the conspiracy and produce an additional investor to the deal. PSR ¶¶ 16-17. Eventually, this newly-expanded conspiracy managed to pull together and find ten kilos to transport to Miami, Florida on a commercial aircraft. *Id.* ¶ 17. Upon arrival, the package was seized by law enforcement. *Id.* On this record, no evidence exists that Mr. Vasquez-Drew had the actual wherewithal to do as promised, and actually produce thousands of kilos (or even 450 kilos of cocaine) at a time and then safely transport those thousands of kilos out of Bolivia for eventual transport into the United States. Indeed, the facts show a conspiracy that struggled even to get and ship ten kilos.

Mr. Vasquez-Drew remained in Bolivia until the confidential source reached out to him (and his co-conspirator) and suggested Mr. Vasquez-Drew come to Panama City, Panama, so that he could receive what was to be his share of the profit. Mr. Vasquez-Drew said he could not – he had no money with which to buy a ticket to get from Bolivia to Panama City. The confidential source then offered, and paid for, his trip to Panama City.

Upon arrival in Panama City on March 14, 2019, he was arrested. He agreed to immediate extradition and was then brought to the Southern District of New York on April 15, 2019. He has remained incarcerated at the Metropolitan Correctional Center in New York ("MCC") until mid-February 2020. He was then moved to and has been held at the Metropolitan Detention Center in Brooklyn ("MDC") ever since. PSR at p. 1 and ¶ 21. To date, he has served 17 months behind bars.

**The Advisory Guidelines Calculation and**
**the Department of Probation's Recommendation**

The core of the advisory guidelines calculation in this case is the acceptance by Mr. Vasquez-Drew that "the offense involved 450 kilograms and more of cocaine," leading to a base offense level of 38. PSR ¶ 26. A three level reduction for Mr. Vasquez-Drew's acceptance of responsibility for his offense and timely entry of a guilty plea, results in a total offense level of 36. A total offense level of 36, combined with a criminal history level of zero and criminal history category of I, results in an advisory guidelines sentence of 135-168 months (11.25-14 years) in prison. *Id.* ¶¶ 25-41.

Recognizing the offense conduct is one among many factors to be considered, the Department of Probation has recommended that the Court sentence Mr. Vasquez-Drew to 60 months (5 years) in prison. *See* PSR at pp. 15-17 (Sentencing Recommendation). To reach this recommended non-guidelines sentence, Probation "weighed the defendant's personal

---

[6] The 5-kilogram shipment was a test quantity. In recordings made by the confidential sources, Mr. Vasquez-Drew talked about future deals (of multi-kilogram quantity) which he claimed he and his co-conspirator would transport by cargo planes. Although the record facts make the reality of Mr. Vasquez-Drew's assertions dubious at best, under the case law, the 450 kilo quantity he boasted he could provide would be reasonably foreseeable to him, and so he does not challenge the drug quantity attributed to him/the conspiracy. The conspiracy started in June of 2017 when the confidential source asked for 5 kilograms. Those were lost. The 10 kilos that were then asked for by the confidential source were not delivered until early 2019. Mr. Vasquez-Drew was arrested on March 14, 2019.

Honorable Denise L. Cote                                                                                   August 20, 2020
Judge, United States District Court                                                                              Page 6

characteristics with his role in the offense." *Id.* at 16. Probation expressly acknowledged the seriousness of the offense, and Mr. Vasquez-Drew's role in it, and then properly reasoned the several other important 3553(a) factors including personal characteristics of Mr. Vasquez-Drew – the facts of which were gathered during Probation's investigation of him, the conditions of confinement at both MCC and MDC, his work history while in the jail and his family's current situation in Boliva – counseled against a guidelines sentence:

> Vasquez-Drew lacks a criminal history record, has young children who can benefit from his presence, and has an ailing mother whom he was assisting prior to his arrest. Therefore, we believe that a non-guideline sentence of 60 months' imprisonment, pursuant to 18 USC 3553(a), is sufficient, but not greater than necessary to achieve the sentencing objectives of punishment, incapacitation, and general and specific deterrence.

PSR at p. 16; *see also* Letters of Support (Ex. A).

**Post-Arrest Conduct**

Mr. Vasquez-Drew is sincerely remorseful for becoming involved in the instant narcotics conspiracy. He has seen the harm his actions have caused his mother, his children, and the other members of his family. They trusted and depended on him, and he has failed them badly, and at a time when CoVid19 has ravaged his home. The CDC notes that "Covid19 risk in Bolivia is high and treatment is very limited."[7] The Department of State, on August 6, 2020, issued a Level 4 Warning which simply states: "Do not travel to Bolivia due to COVID-19. Exercise increased caution in Bolivia due to civil unrest."[8] Yet, Mr. Vasquez-Drew wants nothing more than to be allowed to return to Bolivia so that he can help his mother and his children through this worldwide epidemic and a frightening time for them all. He wants to be there while his children are still young and his mother is alive and begin making amends. If given that opportunity, he is determined to make the most of it. He will lead an entirely law-abiding life and never reoffend.

Mr. Vasquez-Drew post-arrest conduct affirmatively shows his remorse and rehabilitation. Mr. Vasquez-Drew "has clearly demonstrated acceptance of responsibility for the offense" and acknowledged his guilt by timely entering a plea of guilty. PSR ¶¶ 33-34. Likewise, Mr. Vasquez-Drew scrupulously has followed the rules at the MCC and at the MDC, incurring no disciplinary sanctions since his incarceration there 16 months ago. *Id.* ¶ 12. To the contrary, he has been an exemplary prisoner, participating in the work detail program and helping prepare and serve breakfast each day. *Id.*

**The Harsh Conditions of His Confinement**

Mr. Vasquez-Drew has been continuously detained since his arrest on March 14, 2019. He spent one month jailed in Panama, followed by 16 months imprisoned at the MCC. PSR at p. 1. The particularly harsh conditions of confinement for Mr. Vasquez-Drew at the jail in Panama,

---

[7] https://wwwnc.cdc.gov/travel/notices/warning/coronavirus-bolivia

[8] https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Bolivia.html

MCC-NY and MDC-Brooklyn warrants giving him less prison time, as his time in prison is, and will be, the psychological and emotional equivalent of a longer term.

Prison time is always harder for those who are incarcerated far from home. Here, for example, Mr. Vasquez-Drew knows that, for the entirety of his sentence, he will have no family visits and will never get to see his children. Bolivia is too far away, and his family is far too poor, for such visits to happen. Even family phone calls do not happen because of the difficulty and expense. Mr. Vasquez-Drew also knows that, unlike others, his family lacks the financial capability to place money in his commissary account. This already harsh and debilitating reality for a prisoner like Mr. Vasquez-Drew is compounded by recent events.

Even before COVID-19, the MCC was subjected to a series of lockdowns, commencing with the apparent suicide of Jeffrey Epstein and continuing to lockdowns caused by searches for smuggled guns and other reasons. These lockdowns further isolated Mr. Vasquez-Drew and worsened prison conditions. Mr. Vasquez-Drew stopped receiving defense counsel visits, his routine was disrupted, he was confined to just his cell for long periods of time, and his cell was repeatedly tossed. Further, the unannounced searching that accompanied these lockdowns disturbed and activated the insects and rats rife at the MCC, making the prison even more unhealthy than usual.

Then, the pandemic hit. The Court is well aware of the extraordinary hardship, anxiety, and danger that the COVID-19 pandemic has had on life at the MCC and the MDC. *See, e.g.,* Class Action Petition for Writ of Habeas Corpus [Docket No. 1] in *Fernandez-Rodriguez et al. v. Licon-Vitale*, Case No. 1:20-cv-03315-ER (S.D.N.Y. April 28, 2020) (describing the MCC's serial failures in dealing with the COVID-19 pandemic and the increasing dangerous situation at the MCC for inmates and staff); Class Action Petition for Writ of Habeas Corpus [Docket No. 1] in *Chunn v. Edge*, Case No. 1:20-cv-1590 (RVK) (describing the MDC's serial failures in dealing with the COVID-19 pandemic and the destruction of medical records to cover up those failures). *See also "Coronavirus pandemic rages at NYC's federal jails — and numbers back lawyers' and staffers' claims that management has a poor grip on the problem"* (April 20, 2020), available at https://www.nydailynews.com/coronavirus/ny-coronavirus-mdc-mcc-bop-20200420-t25khpqxkfdqfmpvixxvlvxqfm-story.html; *"Medical Expert: Federal Jail Intentionally Destroying Medical Records and Hiding Extent of Coronavirus Behind Bars"* (May 1, 2020), available at https://theintercept.com/2020/05/01/mdc-brooklyn-jail-coronavirus-medical-records.

The social distancing that is key to preventing infection is effectively impossible at the MCC and MDC. At the MCC, for example, almost 700 inmates are crowded into a space designed to hold a maximum of 450, and cells, food, and hygiene facilities are all shared. The conditions at the MCC and the MDC – overcrowded and unclean, with shared food and hygiene facilities and no real opportunity for proper prophylaxis – make disease transmission tragically easy. Little wonder, therefore, that the infection rate in U.S. prisons, for both inmates and guards, is significantly greater than the general infection rate in the United States.

During this crisis, which began in mid-March, Mr. Vasquez-Drew has been effectively confined to his cell and deprived of human contact, while constantly afraid that he will become infected with COVID-19 and become seriously ill or even die far away from his family and loved ones. This is a continuing and worsening crisis. As BOP personnel and inmates have fallen ill or tested positive, the usual functions and routines at the MCC that served to ameliorate prison life to some extent – including phone calls, exercise, hot food, showers and hygiene, and

programs – have stopped or broken down. The pandemic and its effects – which will continue to exist at the jails for the foreseeable future – has been uniquely traumatic and made the conditions of confinement there excessively harsh and inhumane. Irrespective of blame, it cannot reasonably be disputed that Mr. Vasquez-Drew's time at the MCC/MDC has been far more punitive than the equivalent time in more usual circumstances.

## ARGUMENT

### The Recommend Sentence of 60 Months (Five Years) In Prison, Followed by Deportation to Bolivia, is A Sufficient Sentence Here

In arriving at an appropriate sentence, this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). That provision directs sentencing courts to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)," i.e., "proportionality, deterrence, incapacitation, and rehabilitation." *Id.; United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) (same). In this regard, the Court "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.") (emphases in original). Here, an individualized assessment of the § 3553(a) factors (and application of the parsimony clause) supports a sentence of 60 months for Mr. Vasquez-Drew.

### A. Mr. Vasquez-Drew's Personal Characteristics and the Nature of the Offense Support the Requested Sentence of 60 Months in Prison

As Probation recognized in recommending a 60-month term, Mr. Vasquez-Drew's personal characteristics support the requested non-guidelines sentence. Mr. Vasquez-Drew has a total history score of zero. This is his first (and last) criminal conviction, and he is a non-violent offender. Outside of this offense, Mr. Vasquez-Drew has led a quiet and admirable life. For most of his entire life, he has functioned as the center of his large family, taking care of his children, his parents, his aunts and uncles, and his cousins. Without his support, his family is struggling, emotionally and financially, to survive. A five-year sentence (as opposed to a guidelines sentence of 11.25 -14 years) recognizes this lack of criminal history and the importance of Mr. Vasquez-Drew to his family. It gives him a chance to return to Bolivia while his mother is still alive and his children are still young and in need of his presence and support.

Similarly, the nature of the instant offense supports the requested sentence of 60 months. The guidelines range is predicated on 450 kilos of cocaine for which Mr. Vasquez Drew accepted responsibility. The actual conspirators, however, never produced more than 15 kilos (five stolen and ten smuggled into Miami). The other 435 kilos were never manufactured or transported and, based on the facts, it is unlikely that Mr. Vasquez-Drew along with his co-conspirators had the genuine ability to manufacture and transport that amount or find anyone who could manufacture or find that amount. Indeed, just getting ten kilos to the United States appears to have stretched Mr. Vasquez-Drew's actual abilities to the limit.

### B. The Goals of Specific and General Deterrence Are Met by the Requested Sentence of 60 Months in Prison

Specific deterrence has been achieved. Mr. Vasquez-Drew accepts responsibility for what he has done, and is deeply ashamed of what he has put his family through. Simply put, Mr. Vasquez-Drew will never break the law again and no recidivism risk exists here. Had regular jail not achieved that goal, the conditions of confinement as described by Judge Furman as worse than those in a third world country, have increased the deterrent effect of incarceration. Thus, specific deterrence is no reason for and provides little support for a sentence longer than 60 months.

As to general deterrence and prison time, that is "a phenomenon that is notoriously difficult (and perhaps impossible) to measure." *United States v. Brady*, No. 02 CR 1043(JG), 2004 WL 86414, at *9 (E.D.N.Y. Jan 20, 2004). Indeed, studies find that "the certainty of being caught is a vastly more powerful deterrent than the punishment," National Institute of Justice, *Five Things About Deterrence* (Sept. 2014), available at http://www.nij.gov/five-things/pages/deterrence.aspx. Here, Mr. Vasquez-Drew already is a cautionary tale to anyone who might be tempted to follow in his footsteps. His arrest, his conviction, a five-year prison sentence half-the-world away from his family and friends, and a subsequent deportation to Bolivia, is sufficient punishment to achieve general deterrence. Any additional incarceration is greater than necessary here.

### C. The Requested Sentence of 60 Months is Sufficient Punishment Here

In weighing the appropriateness of the requested sentence, the Court should take into account the exceptionally harsh conditions of confinement that Mr. Vasquez-Drew has suffered, and will continue to suffer while in prison. To him, 60 months in prison in the United States will be the psychological and emotional equivalent of a far longer term.

### **CONCLUSION**

For the reasons set forth above, we respectfully urge the Court to sentence Mr. Vasquez-Drew to 60 months in prison, a sufficient sentence that will be followed by his deportation back to Bolivia.

Respectfully submitted,

/s/Sabrina P. Shroff
Counsel for Mr. Vasquez-Drew

SPS/hls
Exhibit A (Letters of Support)

cc: All counsel of record