

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 27, 2020

<u>Via ECF</u>

Honorable Denise L. Cote
United States District Judge for the
Southern District of New York
500 Pearl Street
New York, NY 10007

  Re: *United States v. Vasquez-Drew*, S1 19 Cr. 91 (DLC)

Dear Judge Cote:

  The Government respectfully submits this letter in advance of sentencing in this matter, currently scheduled for September 3, 2020, at 9:00 a.m., on the defendant's conviction of conspiring to import cocaine into the United States, in violation of Title 21, United States Code, Section 963. The defendant, seeking to capitalize on the DEA's expulsion from Bolivia, deployed his network of suppliers, government officials, and money launderers in service of a conspiracy to import thousands of kilograms of cocaine into the United States. Accordingly, the Government submits that a sentence within the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 135 to 168 months' imprisonment is warranted and would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing in this case. The Government also submits that the Court should impose forfeiture in the amount of $45,000, and a fine within the Guidelines range of $35,000 and $10 million.

## BACKGROUND

**I. Bolivia: A Major Cocaine Production and Transshipment Hub**

  In 2006, Evo Morales — a former coca farmer and coca union leader — became Bolivia's first indigenous president.[1] Two years later, in 2008, the Bolivian government expelled the U.S. Drug Enforcement Administration ("DEA") and the State Department following tensions relating to, among other things, U.S. anti-narcotics policies in the region. Since that time, cocaine traffickers in Bolivia have acted with impunity, increasing cocaine production in-country and also acting as a transit point for cocaine manufactured in Peru, headed toward

---

[1] CIA World Factbook: Bolivia, *available at* https://www.cia.gov/library/publications/the-world-factbook/geos/bl.html.

Brazil and then for international distribution.[2]  Indeed, Bolivia's "position at the heart of South America's drug trade and weak, corrupt security forces [] facilitate Bolivia's role as a key transit nation for narcotics heading to Brazil, Argentina, Europe and Asia."[3]  While most of the cocaine imported into the United States originates in Colombia, Bolivia and Peru also account for the drug's ubiquitous presence in our country.[4]

   Recognizing Bolivia's centrality in the global cocaine supply chain, the United States, in August 2019, identified Bolivia as "a major drug transit or major illicit drug producing" country, along with others such as Colombia, Afghanistan, Venezuela, and Mexico.[5]  The United States further singled out Bolivia, alongside the illegitimate regime of Nicolás Maduro Moros in Venezuela, as failing to adhere to their obligations under international counter-narcotics agreements.[6]  In 2019, and then again in 2020, the U.S. State Department identified Bolivia as the third-largest producer of cocaine in the world.[7]  While the ouster of President Evo Morales in November 2019 has been viewed as a positive step for the country, the Bolivian government and FELCN, its purported anti-narcotics force, remain rife with corruption.  Indeed, Morales' resignation has reportedly "created a power vacuum"[8] in the country, which is likely to lead to further instability and a continued rise in cocaine exports.

---

[2] *See, e.g.*, Wall Street Journal (Nov. 19, 2019): Morales Made Bolivia a Narco State, *available at* https://www.wsj.com/articles/morales-made-bolivia-a-narco-state-11574018858.

[3] InSight Crime: Bolivia Profile, *available at* https://www.insightcrime.org/bolivia-organized-crime-news/bolivia/

[4] Business Insider (Sep. 14, 2017): Here's how drugs are getting smuggled from South America to the US, *available at* https://www.businessinsider.com/heres-how-drugs-are-getting-smuggled-from-south-america-to-the-us-2017-9 ("Much of the cocaine from the region — Colombia, Bolivia, and Peru are the world's biggest producers — travels to the US, plying sea and air routes in the eastern Pacific and Caribbean, as shown by the map below, which was prepared by US Southern Command and displayed at the hearing.").

[5] *See* Memorandum on the Presidential Determination on Major Drug Transit or Major Illicit Drug Producing Countries for Fiscal Year 2020; *available at* https://www.whitehouse.gov/presidential-actions/memorandum-presidential-determination-major-drug-transit-major-illicit-drug-producing-countries-fiscal-year-2020/.

[6] *Id.*

[7] *See, e.g.*, State Department: 2020 International Narcotics Control Strategy Report, *available at* https://www.state.gov/wp-content/uploads/2020/06/Tab-1-INCSR-Vol.-I-Final-for-Printing-1-29-20-508-4.pdf ("Colombia remains the world's largest producer of coca and cocaine, followed by Peru and Bolivia, respectively.").

[8] Washington Post (Nov. 13, 2019): How Evo Morales Fell and Plunged Bolivia Into Chaos, *available at* https://www.washingtonpost.com/business/energy/how-evo-morales-fell-and-plunged-bolivia-into-chaos/2019/11/12/ff91d332-05a9-11ea-9118-25d6bd37dfb1_story.html

## II. The Government's Investigation

In response to this pervasive cocaine production and trafficking, the Bilateral Investigations Unit of the DEA's Special Operations Division began to target Bolivian drug traffickers in approximately 2017. With his drug-trafficking network and experience, the defendant provided the DEA—and in particular two confidential sources ("CS-1," and "CS-2," together the "CSes")—an ideal entry-point into the country's cocaine trafficking community. Over the next two years, Vasquez-Drew repeatedly offered the CSes access to his drug-trafficking contacts and infrastructure with the express goal of importing thousands of kilograms of poison into the United States.

### 1. 2017: Vasquez-Drew Introduces CS-1 to Bolivian Military Officials to Facilitate Cocaine Shipment

Starting in May 2017, the DEA recorded meetings between the CSes, Vasquez-Drew, and his co-conspirators. CS-1 first met with the defendant in approximately June 2017 in Bogota, Colombia to discuss exporting large quantities of cocaine from Bolivia to the United States. PSR ¶ 14. During their discussions, Vasquez-Drew told CS-1 that through his connections in the military, he could access an MD-11 aircraft—a military cargo plane—in order to transport 60 tons of cocaine. *Id.* Vasquez-Drew also noted that he and other drug traffickers had been able to operate with impunity in Bolivia because the DEA and the CIA had been "kicked out" of the country several years ago, and the only remaining drug enforcement officials were willing to take bribes from Vasquez-Drew to facilitate drug trafficking. Vasquez-Drew and CS-1 also discussed details about Vasquez-Drew's cocaine laboratories (including the fact that Vasquez-Drew had access to a laboratory of his own), as well as pricing, and logistics for a sample delivery of cocaine to the United States. Vasquez-Drew consistently used terms familiar to those with deep experience in the drug industry including "bricks" to refer to kilograms of cocaine and "kitchens" to refer to laboratories. Vasquez-Drew also described previously sending his then-pregnant wife to Miami to facilitate the shipment of disassembled small aircraft to Bolivia to be used to "air-drop" cocaine exported through Peru. Following the meeting in Colombia, Vasquez-Drew sent CS-1 the following photograph, which depicts dozens of kilograms of cocaine stamped "ORO."



In October 2017, Vasquez-Drew followed through on his earlier promise and introduced CS-1 to a retired Bolivian General and an active Lieutenant Colonel in the Bolivian Air Force. The military officials then provided CS-1 and the defendant with a tour of aircraft at Bolivia Air Force Base in El Alto, Bolivia while the parties discussed various pricing options for exporting cocaine from Bolivia using these planes. Vasquez-Drew demonstrated to the CSes through these meetings that he had the experience and the network to facilitate a large-scale cocaine trafficking conspiracy.

### 2. February – April 2018:  Vasquez-Drew Arranges a Five-Kilogram Sample of Cocaine for Distribution in the United States

On February 20, 2018, CS-1 and CS-2 met in Bolivia with Vasquez-Drew, who introduced Osvaldo Londono-Vanegas ("Londono") as his cocaine supplier. PSR ¶ 15. During the meeting, Vasquez-Drew explained to the CSes the ease in which he uses corrupt military and law enforcement officials to facilitate his drug business:

| CS-1 | No, but I mean, this is the strangest business in the world. In order for it to work, the police have to be on your side. |
| Londono | And protection and it is your own protection. |
| Vasquez-Drew | Then, what happens there? There will take it away from, but I have a soldier or a cop there with me. He makes a phone call and bam! [U/I] it goes through just like that. |
| Londono | And you get your stuff back… |

*See* Ex. A, Segment 1.[9] Vasquez-Drew also described the difficulties in moving cocaine from laboratories to air strips. *Id.* at Segment 2 ("All the movements here from the lab… No one can ever move it from the lab. They always have to go on motorcycle . . . be mobile or on their backs . . . until they get to an airstrip. And there, a small plane will arrive at a . . . strip that's nearby."). The parties discussed also discussed the prospect of shipping a cocaine sample and agreed to continue the conversation in the coming months.

The CSes met again with Vasquez-Drew and Londono in Bolivia on several occasions in April 2018. PSR ¶ 15. During these recorded meetings, the parties continued discussing logistics for a test cocaine sample and future larger shipments—the parties discussed loads as large as 1,500 to 1,700 kilograms—and agreed that a five kilogram sample would be sent to Miami. PSR ¶ 18. During one such meeting, Vasquez-Drew assured the CSes that he would provide them with "top notch quality" cocaine and claimed that he had access to a "kitchen" that can make "two hundred" or "three hundred daily" such that in "fifteen days they can have for you one thousand five hundred" kilograms of cocaine. Ex. B, Segments 1 and 2.[10] Vasquez-Drew once again told the CSes that his law enforcement connections would ensure that the plan would succeed as the police "watch[] over the quantity of pounds being pressed firstly." *Id.*,

---

[9] Exhibit A is a compilation of two excerpts from the February 20, 2018 meeting.

[10] Exhibit B is a compilation of four excerpts from a meeting that occurred on April 19, 2018.

Segment 3. On several occasions, the defendant also spoke knowingly about the intricacies of producing cocaine, as exemplified in the following exchange (*id.*, Segment 4):

| Vasquez-Drew | When you want to get it back to its previous form it must be heated up in a double broiler and removed gradually, uh? It has to get yellowish, do you understand me? That's why it loses the luster, it loses everything and becomes yellowish. Regardless if you do it… regardless if you do it with a machine… |
|---|---|
| CS-2 | This one, that, that guy I told you about, they used to work with someone here. It was a man who was with the law, an official, a high ranked one of the government, a thing… who was the one who used to handle all of that for him, and that man left and, and so he switched kitchens and that's why that crap happened to him. |
| Vasquez-Drew | Oh. I am going to tell you one thing, and take it into consideration, if you have your own kitchen, you have your… you have your kitchen, the, the [U/I] administrator, the pump, the dryer, the press, have everything ready there, it's the same thing as liquid, as it is all over the world. Do you know why? They also say that because they are not meticulous enough to be on top of that, so they come to the city in a line that is done [U/I] that at the end they reach agreements they get brainwashed into, no? "That they are grinding [U/I] a bit of merch… so it comes out better, so it has more…" you know how that is. |

During the April meetings, Londono committed to supplying the sample, which the parties agreed would be flown directly into the United States via a commercial aircraft. Vasquez-Drew also agreed to stamp the cocaine with the letters "SOD" at the CSes' request. The CSes paid Vasquez-Drew and Londono $15,000 for the sample, and at a subsequent meeting in April 2018, Vasquez-Drew and Londono showed the CSes the bricks of cocaine. *Id.* ¶ 16. Vasquez-Drew and Londono also advised the CSes that the transport of the cocaine to Miami would cost $30,000 (a rate of $6,000 per kilogram), which included the costs of bribing Bolivian airport officials to facilitate the shipment.

### 3. May 2018: Vasquez-Drew and his Co-Conspirators Launder $30,000 from New York to Bolivia for the Five-Kilogram Cocaine Sample

During the course of the April 2018 meetings, Londono and Vasquez-Drew introduced the CSes to two money-laundering contacts, Ruben Rojas-Bascope ("Ruben") and Victor Rojas-Bascope ("Victor"), who are brothers. *Id.* ¶ 15. During one recorded meeting with Ruben, the CSes described the plan to transport cocaine to New York and Ruben indicated that he could facilitate the transfer of money from the United States to Bolivia. On May 10, 2018, CS-1 gave Victor $30,000 in Manhattan as payment for the transportation costs that the CSes discussed previously with Vasquez-Drew and Londono. Victor counted the cash and called Vasquez-Drew (among other co-conspirators) in front of CS-1 to confirm that he (Victor) had received the money.

### 4. July-September 2018: The Cocaine Sample Is Purportedly Stolen by Bolivian Airport Officials

Despite the $30,000 payment, the cocaine sample did not arrive in the United States. *Id.* ¶ 16. In July 2018, Londono and others told the CSes that the sample had been stolen by corrupt airport officials in Bolivia. *Id.* Undeterred, Vasquez-Drew and his co-conspirators set out to arrange for a replacement sample of 10 kilograms to be shipped. PSR ¶ 17. On September 15, 2018, Londono sent CS-1 the flight number and a video of luggage being loaded onto a plane. Londono also sent CS-1 several pictures, one of which is depicted below, of the ten-kilogram sample packed into the luggage with the specific markings requested by the CSes.



On September 15 and 16, 2018, CS-1 communicated with Vasquez-Drew and Londono via WhatsApp regarding the impending flight. Based on the information provided to CS-1 by Londono, U.S. Customs and Border Protection agents in Miami identified the luggage in which the cocaine was concealed. Inside two suitcases was a load of approximately 10.4 kilograms of cocaine that matched the images previously sent by Londono to CS-1. On March 14, 2019, Vasquez-Drew and Londono were arrested in Panama City, Panama after being lured to the country by the prospect of continuing their drug trafficking negotiations with the CSes.

I. **Procedural History**

On February 12, 2019, the defendant was charged in Indictment S1 19 Cr. 91 (DLC) (the "Indictment") in the Southern District of New York. The Indictment charged the defendant with (i) conspiring to import five kilograms and more of cocaine into the United States, in

violation of Title 21, United States Code, Section 963 ("Count One"); (ii) conspiring to transmit funds from the United States to Bolivia with the intent to promote specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2 ("Count Two"); and (iii) manufacturing and distributing five kilograms and more of cocaine, and aiding and abetting the same, knowing or intending that it would be imported into the United States, in violation of Title 21, United States Code, Section 959 and Title 18, United States Code, Section 2 ("Count Three").

On April 17, 2019, Vasquez-Drew's initial appearance took place in the Southern District of New York, where he was ordered detained. *See* Dkt. 15. On February 14, 2020, the defendant pled guilty to Count One of the Indictment pursuant to a plea agreement (the "Plea Agreement"). PSR ¶ 9. In the Plea Agreement, the defendant stipulated that the offense conduct involved more than 450 kilograms of cocaine—the highest level available under the Guidelines. *See id.* The Plea Agreement included a Stipulated Guidelines Range of 135 to 168 months' imprisonment. *Id.* Consistent with the Plea Agreement, the Probation Office calculates a total offense level of 33, criminal history category of I, and Guidelines range of 135 to 168 months' imprisonment. *Id.* ¶¶ 63.

## DISCUSSION

### I. A GUIDELINES SENTENCE IS APPROPRIATE IN THIS CASE

The Government respectfully submits that a Guidelines sentence would be sufficient, but not greater than necessary, to comply with the purposes of sentencing. In particular, the seriousness of the offense, the history and characteristics of the defendant, the need to promote respect for the law, and the importance of achieving deterrence all support the imposition of a Guidelines sentence in this case.

The nature and circumstances of the defendant's offense merit a serious sentence. *See* 18 U.S.C. §§ 3553(a)(1). Vasquez-Drew conspired to import thousands of kilograms of cocaine into this country, an amount equal to hundreds of times the five-kilogram quantity of cocaine that suffices to trigger a 10-year mandatory minimum sentence. Indeed, the defendant and his co-conspirators negotiated in terms of metric tons of cocaine—enough to flood this community for years and place him comfortably, and undisputedly, within the highest bracket of the Guidelines Drug Quantity Table.[11] "[T]he harm that is done by a ton of cocaine is almost incalculable. The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering."[12] "[T]he drugs at issue here cripple individuals and destroy families and

---

[11] Statistics compiled by the U.S. Sentencing Commission shed additional light on the truly extraordinary scope of the defendant's crimes. In 2017, the year the conspiracy began, only 467 out of 3,736 defendants prosecuted for trafficking in powder cocaine had a base offense level of 38. *See* Ex. C. Although it appears that in 2019, the Sentencing Commission did not release the a data set with the same level of granularity, the 2019 data reveals that only 6.7% of drug cases involved a base offense level of 38. *See* Ex. D.

[12] (Tr. 27, *United States v. Palagio Suarez*, 16 Cr. 453 (RJS) (Dkt. No. 160)).

whole communities." *United States v. Santibanez*, No. 13 Cr. 912 (RJS), 2020 WL 3642166, at *3 (S.D.N.Y. July 6, 2020) (internal quotation marks omitted). Thus, as Judge Castel noted in another case, the defendant "participated in an important way in the distribution of a substance, which creates misery in the lives of the people who use it," and "was indifferent to the poison that was being distributed and ruining people's lives."[13]

Beyond drug quantity, the sophistication reflected in the defendant's conduct further supports a Guidelines sentence. The kilograms of cocaine that the defendant showed and tried to deliver to the CSes bore markings requested by the DEA, which confirms the access to cocaine-production facilities that the defendant described during meetings. Put another way, he was able to provide cocaine with markings specified by law enforcement because he had access to laboratories making those kilograms. The defendant also confirmed the access to corrupt military officials that he described during meetings by taking CS-1 to a military base, introducing them to military officials, and permitting them to tour Bolivian military facilities. By doing so, the defendant demonstrated an intent to facilitate large-scale drug trafficking using a massive cargo aircraft capable of carrying the thousands of kilograms he was negotiating with the CSes. The gravity of this aspect of the defendant's offense conduct is illustrated by considering the level of sophistication, experience, and access that would be required for someone to bring the CSes—purporting to be large-scale drug traffickers—on to a U.S. military base, introduce them to U.S. military personnel, show them U.S. military aircraft, and negotiate using those assets to transport thousands of kilograms of cocaine. Put simply, the seriousness of that aspect of the defendant's conduct is breathtaking. And that is not all he did. When the defendant sent the cocaine samples, he demonstrated access to a distinct means of transportation using Bolivian customs officials at commercial airports, and was successful in secreting 10 kilograms of drugs in luggage placed on a commercial flight that created an exceedingly dangerous situation for the unwitting passengers who used the same plane. In the absence of the DEA's interdiction, the defendant would have created the same risks at Miami International Airport, and he fully intended to do so without regard to the consequences of that behavior. Finally, the defendant demonstrated the scope of his network when he introduced the CSes to the Rojas-Bascope brothers and was able to facilitate the receipt of $30,000 in purported drug proceeds in New York as well as with the laundering of those funds back to Bolivia.

The history and characteristics of the defendant and the need to promote respect for the law also call for a substantial sentence. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). The defendant had ample opportunity to lead a law-abiding life. He benefitted from a "good relationship with his family members" and a "good childhood." PSR ¶¶ 43-44. He graduated from high school, and obtained technical training relating to computers. *Id.* ¶¶ 56-57. He chose a different, illicit course. Throughout months of negotiations with the CSes, the defendant made clear time and time again that the DEA's expulsion from Bolivia provided an unique opening to use the country as a source of cocaine supply to the United States. Vasquez-Drew then repeatedly called upon his network of military officials, cocaine suppliers, money launderers, and others to execute on this opportunity. Vasquez-Drew also made it clear that this was not his first time engaging is such narcotics trafficking: he described several previous drug deals—including a prior transaction with a Dutch customer and drug shipments to Paraguay and Brazil—and assured the

---

[13] (Tr. 22, 24, *United States v. Aguirre Cuero*, 15 Cr. 125 (PKC) (Dkt. No. 83)).

CSes that he protects his illicit dealings through bribing Bolivian public officials, including senior members of the Bolivian government. Absent the involvement of individuals like the defendant—connectors who can leverage their access and experience—the flow of cocaine from South America would be much diminished. Indeed, such massive cocaine distribution schemes require networked individuals to corral government officials, suppliers, and money launderers. In being all too eager to play this role—and trying to capitalize on the DEA's absence in Bolivia—the defendant manifested a deep disrespect for the law and thus deserves a Guidelines sentence.

The need to afford adequate deterrence to the defendant and others similarly situated, and to protect the public from other crimes of the defendant, also speaks loudly to the need for a serious sentence in this case. *See* 18 U.S.C. §§ 3553(a)(2)(B)-(C). The defendant's drug-trafficking activities involving government connections is not an aberration but, rather, endemic of one of the most serious issues facing American efforts against cocaine trafficking over the last several decades. Indeed, the most well-worn cocaine trafficking routes to this community often rely upon public officials abusing their positions to enable the flow of illicit narcotics.[14] The sentence imposed should therefore demonstrate that cocaine trafficking will not be tolerated, and that drug dealers, like the defendant, who sell such poison while lining the pockets of corrupt officials along the way, will face significant consequences when they are caught. Overseas traffickers must understand that they will face harsh consequences for their illicit trafficking if caught by U.S. law enforcement—consequences that will substantially outweigh the alluring financial upside of their crimes. With respect to specific deterrence, the defendant is seeking to return to the country from which he previously operated his years-long drug export scheme; he will, assuredly, be tempted to return to criminal conduct. As such, the need to deter the defendant and others who would consider the same path should carry a heavy weight in determining the defendant's sentence.

## II. THE DEFENDANT'S SENTENCING ARGUMENTS ARE MERITLESS

The defendant makes principally three arguments in favor of a below-Guidelines sentence: (i) the Guidelines range is inflated and does not accurately capture his conduct, Def. Ltr. at 1-2; (ii) this case has had collateral consequences on the defendant and his family, *id.* at 8; and (iii) the goals of deterrence would be met by a sentence of 60 months in prison, *id.* at 9. These arguments are unpersuasive.

The defendant's attempts to minimize his culpability are unavailing and in many ways troubling, as they evidence that the defendant has not truly accepted responsibility for his criminal conduct, heightening the risk of recidivism. First, the defendant argues that he merely "accept[ed] the offer" from the Government's confidential source to become involved in the cocaine trafficking and that he "had no intent to harm the United States." Def. Ltr. at 1. The

---

[14] *See, e.g.*, State Department: 2019 International Narcotics Control Strategy Report, *available at* state.gov/wp-content/uploads/2019/04/2018-INCSR-Vol.-I.pdf. ("Public corruption, including among senior government officials, is a major problem in Venezuela, making it easier for drug-trafficking organizations to smuggle illegal drugs.").

contention is refuted by the defendant's emphasis on the absence of U.S. law enforcement in Bolivia as an opportunity to commit crimes against this country with impunity. Moreover, it was the defendant, not the DEA, who boasted that he could ship tons of narcotics to the United States on military cargo planes, and then he brought the CSes to a military base to show them exactly what he was talking about. It was the defendant, not the DEA, who helped supply a five-kilogram and then a ten-kilogram sample of cocaine to ship to this country. It was the defendant, not the DEA, who discussed in detail the methods he would employ to transport cocaine to America. And it was the defendant, not the DEA, who activated his network to ensure the success of the deal. The defendant was no naïve livestock trader who the DEA lured unwillingly into this opportunity, as portrayed by his submission. Quite the contrary: The defendant was well versed in the logistics, relationships, and language required to export large amounts of drugs and he jumped at the opportunity to sell those drugs into this country. Moreover, this was no aberration or one-off mistake; it was a serious pattern of criminal conduct that lasted for years, required international travel, and, in the defendant's own words, was not the first time he engaged in such international cocaine deals. To now argue otherwise does nothing except show that the defendant has not truly accepted responsibility, speaking to the need for a serious sentence to deter future criminal conduct.

Next, the defendant contends that his Guidelines range—which he stipulated to by plea agreement—is predicated on an inflated base offense level as his "statements and promises" regarding drug quantities were "not at all indicative of ability" but rather "puffery and braggadocio." Def. Ltr. at 2. This argument is flatly contradicted by the defendant's actions. The defendant said he was going to introduce CS-1 to military officials to discuss the use of military aircraft to export cocaine and he did just that (and more, organizing a tour of a Bolivian air force base). The military cargo plane that the defendant helped showcase to CS-1 shows that his plan was very real, and that he had the intention and ability to facilitate the transportation of the ton quantities of cocaine he negotiated with the CSes. The defendant said he would find a source of supply and money launderers to repatriate money back to Bolivia and he did just that. And the defendant said he would ship a ten kilogram sample to the United States and he did just that. At each juncture that the defendant's capabilities were tested in the instant offense, he proved himself to be a man of his word: an experienced, capable drug trafficker with the knowledge and connections to traffic thousands of kilograms of cocaine. Furthermore, the defendant's ability to source and distribute 15 kilograms of cocaine belies his argument that he was a poor livestock trader with limited drug trafficking connection. Fifteen kilograms of cocaine is, itself, a substantial quantity. The value of that cocaine in Bolivia is approximately $45,000, and approximately $500,000 once it reaches the United States. And the consequences of 15 kilograms of cocaine reaching U.S. shores is devastating—equating to tens of thousands of individual doses of poison.

The Government maintains—and the evidence bears out—that Vasquez-Drew served as a significant facilitator and used his access, infrastructure, and network to pull together a team to import large quantities of cocaine into the United States. He was not ultimately successful in his efforts because the DEA intervened by arresting him before a significantly larger load was sent to the United States. The DEA's effectiveness does not counsel toward leniency or otherwise diminish the fact that the defendant arranged the importation of a substantial cocaine sample into the United States with the hope that it would be only the beginning of a much larger operation.

Relatedly, the defendant's claim that because he and his co-conspirators only produced 15 kilograms of cocaine—and "never manufactured or transported" the other "435 kilos" nor did they have the ability to do so—misses the mark. Def. Ltr. at 8. This argument, which essentially boils down to the premise that conspiracy is less culpable than actual distribution, evidences a misunderstanding of the law and Congress's intent in drafting certain provisions of Title 21 of the United States Code. "21 U.S.C. § 963 provides that a defendant who has conspired to violate §§ 959 or 960 is to be subject to the same penalties as those prescribed for one who has violated those sections." *United States v. Flores*, 945 F.3d 687, 728 (2d Cir. 2019). The statutory structure reflects the considered decision of Congress that even inchoate conduct relating to these types of drug trafficking are worthy of serious punishment. Moreover, all of the evidence points to the conclusion that the defendant would have imported an additional "435 kilos" and more into the United States had the DEA not stepped in when it did.

The defendant also argues for a below-Guidelines sentence in light of this case's collateral consequences on himself and his family. Def. Ltr. at 8. Specifically, the defendant claims that the nature of his 16-month incarceration at MCC, which has included extended periods of lockdown during the COVID-19 pandemic, heavily favors leniency. This argument is unconvincing for as the lockdowns were the result of reasonable and temporary steps that the MCC has taken to protect inmates such as the defendant, and they are similar to actions the entire country has taken in order to slow the spread of the virus. The defendant also argues that his arrest and incarceration have had a devastating impact emotionally and economically on his family. *Id.* While this may very well be true, it is sadly the case for nearly all families with incarcerated loved ones. Perhaps for this reason, the Second Circuit has held that a defendant's "family ties . . . generally only justify a downward departure in 'unusual' or 'extraordinary' cases[.]" *United States v. Lyttle*, 460 F. App'x 3, 10 (2d Cir. 2012); *see also* U.S.S.G. § 5H1.6 ("In sentencing a defendant . . . family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted."). Furthermore, these unfortunate consequences of criminal conduct were entirely foreseeable to the defendant; no one else but the defendant made the choices that resulted in him being separated from his family. *See United States v. Al Kassar*, No. 07 Cr. 354 (JSR), 2020 WL 4813199, at *2 (S.D.N.Y. Aug. 19, 2020) ("[W]hile the Court is cognizant of the burden imposed by defendant's inability to see his loving family, anyone who commits as serious a crime as this defendant must know in his heart that if he is caught and imprisoned, it is his own family who may suffer the worst."). Accordingly, these concerns should not carry significant weight in determining the defendant's sentence.

Finally, the defendant argues that the goals of specific and general deterrence will be served by a below-Guidelines sentence. Def. Ltr. at 9. In arguing in conclusory fashion that he is no longer a risk to his community, the defendant completely ignores the reality of his offense conduct and the risk that he will return to his previous criminal livelihood. The defendant's claim that he supported himself and his family by "trading livestock" for an unspecified "salary" is deeply suspect on its face, and even more so relative to his statements to the CSes about his drug-trafficking career. PSR ¶¶ 58-59; *see also id.* ¶¶ 43, 45 (suggesting, despite no reported income figures, that the defendant is at least partly financially responsible for his mother and three children). While the defense counsel promises that the defendant "will never break the law again," *id.*, he could easily resume this criminal conduct once he is back in Bolivia; the

Case 1:19-cr-00091-DLC   Document 47   Filed 08/27/20   Page 12 of 14

Page 12 of 14

defendant will undoubtedly return to some of the connections and infrastructure which he had before he was arrested. This is particularly true because rampant narcotics trafficking and corruption still plague Bolivia, such that the defendant will be confronted with opportunities to reengage in trafficking and other criminal conduct.

The need for general deterrence also supports the imposition of a Guidelines sentence. Such a sentence is necessary to deter overseas traffickers who, by virtue of the fact that their conduct disproportionately impacts communities a world away, believe they are beyond the reach of the law. *Cf. United States v. Romero*, 749 F. App'x 31, 35 (2d Cir. 2018) ("[T]he district court acted well within its discretion when it imposed a sentence reflecting the need to deter government officials from using their positions of power to facilitate drug trafficking."). The defendant's comments regarding the absence of U.S. law enforcement in Bolivia serve to underscore operating in that country. The Court should therefore send a strong message to those individuals that selling poison in the United States carries serious consequences.

### III.   THE COURT SHOULD IMPOSE $45,000 IN FORFEITURE

The Court should require the defendant to forfeit the $45,000 the CSes paid him in connection with the cocaine samples.

Pursuant to Title 21, United States Code, Section 853, "a defendant convicted of a drug crime 'shall forfeit . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of' the crime of conviction." *United States* v. *Roberts*, 660 F.3d 149, 165 (2d Cir. 2011) (quoting 21 U.S.C. § 853(a)(1)). "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or broader words to define the scope of what was to be forfeited." *United States* v. *Monsanto*, 491 U.S. 600, 607 (1989). The purpose of forfeiture is "punitive rather than restitutive," *United States* v. *Roberts*, 660 F.3d at 166, and the defendant's ability to pay is irrelevant, *United States* v. *Awad*, 598 F.3d 76, 78 (2d Cir. 2010).

The defendant admitted to the forfeiture allegations in the Indictment pursuant to his plea agreement. PSR ¶¶ 5-7, 76. CS-1 handed the defendant $15,000 in connection with the first, attempted cocaine sample. CS-1 then paid $30,000 to Victor in Manhattan in connection with the second, completed sample transaction. During the meeting in Manhattan, Victor communicated with the defendant to confirm the payment, thereby adequately demonstrating constructive control of the funds for purposes of forfeiture. The fact that the defendant subsequently sent the 10-kilogram sample to the CSes further supports the conclusion by a preponderance of the evidence that the defendant ultimately obtained the $30,000 that he told the CSes he would use to pay transportation costs. 18 U.S.C. § 981(a)(2)(A) ("[T]he term 'proceeds' . . . is not limited to the net gain or profit realized from the offense."). Accordingly, the Court should require the defendant to forfeit these funds. Enclosed for the Court's consideration is a proposed order of forfeiture. *See* Ex. E.

### IV.   THE COURT SHOULD IMPOSE A GUIDELINES FINE

The Court should also impose a fine within the stipulated Guidelines range of $35,000


and $10 million.  *See* PSR ¶ 8.

The Sentencing Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."  U.S.S.G. § 5E1.2(a).  "The burden of establishing inability to pay rests on defendant."  *United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001) (citing *United States v. Thompson*, 227 F.3d 43, 45 (2d Cir. 2000)).

The defendant has not met his burden of establishing that he is unable to pay a fine.  The defendant failed to provide information regarding his finances to the Probation Office, even failing to quantify the purported "salary" that he earned in the "livestock" industry.  PSR ¶ 60, 62; *see United States v. Sasso*, 59 F.3d 341, 352 (2d Cir. 1995) (given that defendant "was not forthcoming with respect to his financial circumstances, it was well within the province of the district court to find that he had not carried his burden of proving inability to pay").  Probation therefore concluded, "[b]ased on the lack of information available," that it is "unknown if the defendant is able to pay a fine."  PSR ¶ 62.  While the PSR notes that the defendant has benefitted from appointed counsel, *see id.*, this consideration is hardly dispositive of his ability to pay.  *United States v. Fields*, 113 F.3d 313, 325-26 (2d Cir. 1997) (reasoning that "the fact that a defendant is represented by or has been found eligible for appointed counsel certainly strongly suggests an inability to pay a fine" but is not "conclusive") (citation omitted)); *see also United States v. Corace*, 146 F.3d 51, 57 (2d Cir. 1998) ("[A] sentencing judge is not bound by the recommendation of the PSR . . .").  On the other hand, while the Government is not required to establish that the defendant can pay a fine, his recorded statements regarding a history of lucrative large-scale drug trafficking and his ability to pay for travel to meetings with the CSes both suggest that he has the means to do so.  *See United States v. Orena*, 32 F.3d 704, 716, (2d Cir. 1994) (explaining that "evidence of lucrative illegal activity can support a judge's finding that a defendant is able to pay a fine . . . .").  Accordingly, in light of the defendant's failure to meet his burden on this issue, the balance of the Section 3553(a) considerations described herein warrant the imposition of a fine within the Guidelines range that will serve as not only appropriate additional punishment, but also as a critical component of the general deterrence message resulting from the upcoming sentencing.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully submits that the Court should impose a term of incarceration within the Guidelines range of 135 to 168 months' imprisonment, forfeiture in the amount of $45,000, and a fine within the Guidelines range of $35,000 and $10 million.

                                                                                 Respectfully submitted,

                                                                                 AUDREY STRAUSS
                                                                                 Acting United States Attorney

                                                        By: /s/
                                                              Sam Adelsberg
                                                              Matthew Hellman
                                                              Amanda Houle
                                                              Michael Krouse
                                                              Assistant United States Attorneys
                                                              (212) 637-2494

Enclosure

cc:      Defense Counsel (by ECF)