**SABRINA P. SHROFF**  233 BROADWAY
ATTORNEY AT LAW  NEW YORK, NEW YORK 10007
TELEPHONE: (646) 763-1490

September 3, 2020

**BY ECF**

Honorable Denise L. Cote
United States District Judge for the
 Southern District of New York
500 Pearl Street, Courtroom 18B
New York, NY 10007-1312

**Re: United States v. Vasquez-Drew, 19 Cr. 91 (DLC)**
   (Reply Sentencing Letter of Mr. Vasquez-Drew)

Dear Judge Cote:

I write on behalf of my client Percy Arturo Vasquez-Drew and in reply to the Government's August 27, 2020 sentencing letter (the "Opp. Letter"). For the reasons below, and those set forth by the Department of Probation in the Presentence Report ("PSR") and in Mr. Vasquez-Drew's August 20, 2020 sentencing letter (the "8/20 Letter"), Mr. Vasquez-Drew should be sentenced to 60 months (five years) in prison, followed by deportation back to Bolivia. Sixty months is the sentence recommended by the Department of Probation following its independent investigation into the circumstances of the defendant and offense at issue. Mr. Vasquez-Drew's sentencing is currently scheduled for September 10, 2020.

   I. **THE NON-GUIDELINES SENTENCE OF 60 MONTHS IN PRISON RECOMMENDED BY THE DEPARTMENT OF PROBATION REMAINS THE APPROPRIATE SENTENCE FOR MR. VASQUEZ-DREW**

In his 8/20 Letter, Mr. Vasquez-Drew explained how the recommended five-year sentence was "sufficient but not greater than necessary" to achieve the sentencing goals of proportionality, deterrence, incapacitation, and rehabilitation. Specifically, the requested sentence properly takes into account the seriousness of Mr. Vasquez-Drew's actual criminal conduct and meets the goals of sentencing, while also recognizing Mr. Vasquez-Drew's familial responsibilities; his lack of a prior criminal history; the unusually difficult conditions of his confinement; that he has not a single disciplinary infraction and worked all through his time in jail; and his sincere remorse for what he has done and attendant commitment to never reoffend. *See* 8/20 Letter at 1-9. Nothing in the government's sentence letter alters the conclusion that 60 months remains the appropriate sentence here.

   A. **A 60 Month Sentence Remains Appropriate Because the Facts Continue to Demonstrate that the Instant Narcotics Conspiracy Had No Genuine Ability to Manufacture or Transport Large Amounts of Cocaine into the United States**

Throughout its Opp. Letter, the government tries to paint Mr. Vasquez-Drew as some kind of international narcotics kingpin who controlled a vast "network of military officials, cocaine suppliers, money launderers, and others" (Opp. Letter at 3, 4, 8); could readily produce two to three hundred kilos of cocaine daily, such that in "fifteen days they can have for you one thousand, five hundred" kilos of cocaine (*id.* at 4); could protect the product end-to-end by using

Honorable Denise L. Cote				September 3, 2020
Judge, United States District Court				Page 2

the "law enforcement connections" he controlled (*id.* at 3); and export these thousands of kilos from Bolivia using "massive military cargo" planes (*id.* at 4, 8). The government's efforts fail.

The facts are far more prosaic. They show that Mr. Vasquez-Drew is no kingpin, and that the large-scale capabilities the government understands is necessary to justify a 135 to 168 month (11.25 to 14 year) guidelines prison sentence never actually existed. Try as it might, the government simply cannot paper over or persuasively explain why, when put to the test, this supposedly vast and well-oiled conspiracy took sixteen months – from April 2017 to September 2018 – to move ten kilos of cocaine from Bolivia to Miami. It is the *reality* of what happened, and not Mr. Vasquez-Drew's wild puffery and fanciful assertions that should drive the Court's sentencing decision. Sixty months is a sufficient sentence for the reality of a conspiracy that, over sixteen months' time, struggled to produce fifteen kilos of cocaine, and (having had five kilos stolen from it) managed to transport just ten kilos in total into the United States.

The facts of what happened shows that, Mr. Vasquez-Drew's fantastical statements aside,[1] the conspiracy at issue was plainly incapable of creating and shipping hundreds, leave alone thousands, of kilos of cocaine.

- Mr. Vasquez-Drew claimed that he had a lab that easily could produce two to three hundred kilos of cocaine *each day*, and 3,000 kilos a month (Opp. Letter at 4). Yet, the conspiracy took three months (April to July 2018) to manufacture and try to move five kilos of cocaine to the U.S. and failed in that attempt. The conspiracy then took another two months (July to September 2018) to manufacture and move ten kilos of cocaine. In other words, instead of 15,000 kilos in five months, the conspiracy proved capable of producing just 15 kilos in five months. Unsurprisingly, the CSes were never shown or given a tour (or even a picture) of the alleged lab or provided any concrete evidence of its existence.

- Mr. Vasquez-Drew claimed that the conspiracy used small planes flying from readily accessible airstrips located near the lab to move its cocaine, as this was "the most reliable" method. Opp. Letter at 4 and Ex. A, Segment 2. Yet, when put to the test, no such airstrips and small planes were used. Instead, the conspiracy tried to smuggle both samples through commercial airports on regular passenger planes. Opp. Letter at 6. The conspiracy did so even after the first five kilo shipment was "stolen by corrupt airport officials," which would make sense only if the airstrips and small planes did not actually exist. *Id.* Likewise, although the conspiracy did manage to arrange a

---

[1] Many of Mr. Vasquez-Drew's claims and boasts to the confidential sources bordered on the absurd. For example, he claimed that he had once sent his pregnant wife to Miami, so she could obtain, disassemble, and ship small aircraft to Bolivia that were then used to "air drop" cocaine throughout Peru. Not only can the government present no independent evidence supporting the truth of this tall tale, it cannot explain why someone with the supposed resources, experience, and prior successes of which Mr. Vasquez-Drew boasted (Opp. Letter at 8-9) did not live a correspondingly wealthy lifestyle and, to the contrary, was so poor he could not afford to fly from Bolivia to Panama to receive his purported share of the profits from the ten kilos shipped to the confidential source. It was the confidential source that had to pay for Mr. Vasquez-Drew's trip to Panama City, so he could be arrested in Panama and then extradited to the United States, because Mr. Vasquez-Drew (the supposed kingpin purportedly capable of moving hundreds of millions of dollars of cocaine a year) could not afford to pay even for that one trip from Bolivia to Panama. According to Google, a flight from Bolivia to Panama City costs about $600. 00.

Honorable Denise L. Cote                                                                 September 3, 2020
Judge, United States District Court                                                                  Page 3

      courtesy tour of a Bolivian Air Force base[2] through a friend of another member of the conspiracy (not Mr. Vasquez-Drew), the Bolivian Air Force officers they met with on the base were not part of the conspiracy. Indeed, the conspiracy did not discuss using military cargo aircrafts to smuggle cocaine while on the base, and they stopped the confidential informants from speaking about such things while on the base. Clinching the matter, there is no evidence that the conspiracy ever had used, could ever have used, or even ever tried to use, military aircraft or personnel.

- Mr. Vasquez-Drew purportedly "explained to the CSes the ease in which" he used a network of corrupt police and customs officials to protect the cocaine from start to finish. *Id.* at 4, 5. Yet, the conspiracy could not prevent the theft of the first five kilos (*id.* at 6), calling into serious question whether this network of high-ranking cops and government officials truly existed.

- Far from having an established infrastructure capable of manufacturing and importing "metric tons of cocaine" into the United States, (Opp. Letter at 7), producing and delivering just ten kilos of cocaine stretched this conspiracy to its limits. Indeed, just to provide the requested ten kilos to the confidential sources, the conspiracy had to add new members to the conspiracy and produce an additional investor to the deal. *See* PSR ¶¶ 16-17.

- According to the government, 15 kilograms of cocaine is worth approximately $45,000 in Bolivia and "approximately $500,000 once it reaches the United States." Opp. Letter at 10. This is a staggering amount of money when one considers that Mr. Vasquez-Drew claimed to be part of a conspiracy producing 3,000 kilos of cocaine every month. Using the government's estimates, 450 kilos are worth $1,350,000 in Bolivia and $15,000,000 in the United States. If Mr. Vasquez-Drew is this type of drug kingpin, as the government insists, there is no objective evidence of it in the record that he was receiving millions (or even hundreds of thousands) of dollars. To the contrary, the facts show that Mr. Vasquez-Drew had no property to sell and when the five kilos were lost, his co-conspirator was forced to sell his home to pay the debt. Mr. Vasquez-Drew did not live like a multi-millionaire, but like someone who helped fatten cattle for a living. Mr. Vasquez-Drew could not afford even to buy a plane ticket to Panama to get paid by the confidential source – the confidential source paid for the ticket at which point Mr. Vasquez-Drew was arrested. The simplest explanation: Mr. Vasquez-Drew told the confidential sources lie after lie after lie about the conspiracy's capabilities and resources.

      All these facts, and the logical inferences from these facts, strongly rebut the government's claim that Mr. Vasquez was a material part of a vast conspiracy capable of importing tens of thousands of kilos (or even 450 kilos) into the U.S. Plainly, there was never really any there, there. Indeed, some of the "evidence" the government proffers to "prove" that

---

[2] On page 8 of its Opp. Letter, the government mistakenly states the visit was on a U.S. base with U.S. military personnel, and that the use of U.S. military aircraft was negotiated. The government is wrong on all points. It was a Bolivian base with Bolivian military personnel, and no one negotiated the use of military aircraft for drug smuggling with Bolivian military personnel.

Honorable Denise L. Cote                                                September 3, 2020
Judge, United States District Court                                                  Page 4


Mr. Vasquez-Drew was a large-scale trafficker is so desperate that it further proves just the opposite – that Mr. Vasquez-Drew was a small-time amateur. In this regard:

- The government stresses that Mr. Vasquez-Drew sent CS-1 a picture of "dozens of kilograms of cocaine stamped 'ORO'" (Opp. Letter at 3). Such pictures, however, are common on the Internet, and there is nothing connecting Mr. Vasquez-Drew or the conspiracy to the "ORO" cocaine in the picture. In this regard, a simple Google search provides similar pictures of cocaine bricks stamped with various names or logos, including "Boss," "Rolex," "Obamacare," "Cobaine," the Playboy Bunny, and the Scales of Justice, all available for printing and sending to credulous confidential sources.

- Regarding stamping, the government avers that the ten kilos of cocaine bricks shipped to Miami were stamped with the "specific markings [SOD] requested by the CSes" thereby proving Mr. Vasquez-Drew "had access to laboratories making those kilograms." (Opp. Letter at 8; *id.* at 5, 6). In fact, the bricks at issue were not stamped with SOD. Rather, the tape wrapping over the bricks had "SOD" written on then with a Magic Marker. *Cf.* Pictures on Opp. Letter, p. 3 ("ORO" stamp) and p.6 ("SOD" written in black marker). If anything, the fact that the ten kilos were not stamped, as is the usual practice for those with actual access to lab facilities, further proves that the conspiracy had no access to a lab. It also supports the likelihood that the "ORO" picture was obtained from the Internet and proves nothing.

- The government avers that Mr. Vasquez-Drew's use of slang terms like "bricks" and "kitchen" demonstrates his "deep experience in the drug industry" (Opp. Letter at 3). Such terms, however, are widely known. For example, a simple google search of "brick and cocaine" brings up over 4,620,000 results (as of August 31, 2020), and means that, per the government's logic, CNN, NBC, ABC, CBS, BBC, Fox News, USA Today, NY Daily News, the New York Post, Urban Dictionary, and many others, are "deeply experienced" in the drug industry.

The government cites *United States v. Campos Flores*, 945 F.3d 687 (2d Cir. 2019) for the proposition that one who conspires to violate Sections 959 or 960 is subject to the same penalties as one who violated those laws. Opp. Letter at 11. But that is not a matter with which the defense disagrees, and it appears that the government misapprehends Mr. Vasquez-Drew's position and the cited case. *Campos Flores*, which involved issues of what constitutes guilt and whether a sentencing enhancement would be applied to a narcotics conspiracy, recognizes that, when it comes to sentencing, violating the law and conspiring to do so is the same "so long as the necessary factual predicate for the enhancement exists." *Campos Flores*, 945 F.3d at 728 (quoting *United States v. Rendon*, 354 F.3d 1320, 1330 (11th Cir. 2003)). Here, Mr. Vasquez-Drew has pled to the offense, and accepted that under the current case law he would be held to the quantity of 450 kilograms. The Court, may, however, consider other facts and not just the drug quantity in deciding the appropriate consequences Mr. Vasquez-Drew should face for what he did. His sentence should not be principally based on amounts that plainly were beyond the limited capabilities of the conspiracy. Mr. Vasquez-Drew's inflated claims are "a tale told by an idiot, full of sound and fury, signifying nothing" (Macbeth, Act 5, Scene 5). To use that tale to impose a guidelines sentence, as the government urges, would be excessive, and violate the

Honorable Denise L. Cote                                                September 3, 2020
Judge, United States District Court                                                Page 5

parsimony principle that guides federal sentencing.

Application Note 5 to USSG 2D1.1 is also instructive here. The note provides that if a defendant:

> establishes that the defendant did not intend to provide or purchase, *or was not reasonably capable of providing or purchasing, the agreed-upon quantity of the controlled substance,* the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that the defendant did not intend to provide or purchase or was not reasonably capable of providing or purchasing. (Emphasis added.)

Here, Mr. Vasquez-Drew does not challenge the guidelines at issue. In his plea agreement he accepted, and continues to now accept, that had he gone to trial, he would have been convicted of the crime of conspiracy and, under the preponderance standard, of the weight of the conspiracy. All he is arguing here is that, in determining the proper sentence, the Court should consider the fact that he was not "reasonably capable of providing … the agreed-upon quantity." *Id.*

### B. The Other Sentencing Factors Continue to Support a Non-Guidelines Sentence of 60 Months in Prison, Followed by Deportation to Bolivia

Mr. Vasquez-Drew's personal characteristics support the recommended non-guidelines sentence. Mr. Vasquez-Drew is a non-violent offender with a total criminal history score of zero. For most of his entire life, he has functioned as the center of his large family, taking care of his children, his parents, his aunts and uncles, and his cousins. Without his support, his family is struggling, emotionally and financially, to survive.  A five-year sentence (as opposed to a guidelines sentence of 11.25 -14 years) recognizes these facts, that he is a true "0" in criminal history and the importance of Mr. Vasquez-Drew to his family, especially now in the time of COVID19. It gives him a chance to return to Bolivia while his mother is still alive, and his children are still young and in need of his presence and support. He sincerely regrets his criminal actions and is determined to never re-offend.

While the impact of incarceration on a defendant's family may not require that the Court grant a downward departure (Opp. Letter at 11), the Court may consider the impact of continued incarceration on others. Mr. Vasquez-Drew's support of his family is relevant to his personal characteristics and likelihood of recidivism and the Court's evaluation of what constitutes an appropriate sentence. In this regard, it is well-settled that the Court "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.") (emphases in original). Mr. Vasquez-Drew's personal characteristics support the recommended 60month sentence.

Similarly, specific deterrence has been achieved. Mr. Vasquez-Drew accepts responsibility for what he has done and is pained by what he has put his family through. That he is contributing to their suffering during the COVID19 crisis, which has hit Bolivia especially hard,[3] is not lost on him. Simply put, Mr. Vasquez-Drew will never break the law again and no

---

[3] The Center for Disease Control notes that "Covid19 risk in Bolivia is high and treatment is very limited."

Honorable Denise L. Cote  September 3, 2020
Judge, United States District Court  Page 6

recidivism risk exists here. All he wants now is to serve the five years recommended by the Department of Probation and then return to his family while there is still time to make amends and a positive impact on his children. While the government baldly speculates that, as a Bolivian, Mr. Vasquez-Drew is more likely to recidivate (Opp. Letter at 11-12), such speculation borders on the improper and should be rejected by the Court. Mr. Vasquez-Drew's post-arrest conduct affirmatively shows his remorse and rehabilitation. Mr. Vasquez-Drew "has clearly demonstrated acceptance of responsibility for the offense" and acknowledged his guilt by timely entering a plea of guilty. PSR ¶¶ 33-34. Likewise, Mr. Vasquez-Drew scrupulously has followed the rules at the MCC and at the MDC, incurring no disciplinary sanctions since his incarceration there 16 months ago. *Id.* ¶ 12. He has been an exemplary prisoner, participating in the work detail program and helping prepare and serve breakfast each day. *Id.* Sixty months in prison is more than sufficient to specifically deter Mr. Vasquez-Drew.

Five years in prison is also sufficient to meet the sentencing goal of general deterrence. The government apparently contends that a guidelines sentence should be imposed because Mr. Vasquez-Drew is Bolivian and there is a particular need to deter Bolivia and Bolivian traffickers (*see* Opp. Letter at 1-2, 11-12). The government cites no study or apposite case law supporting its dubious position that Bolivians need particular deterrence.[4] Nor does it address the fact that "the certainty of being caught is a vastly more powerful deterrent than the punishment," National Institute of Justice, *Five Things About Deterrence* (Sept. 2014), available at http://www.nij.gov/five-things/pages/deterrence.aspx. Mr. Vasquez-Drew's circumstances -- his arrest, his conviction, a five-year prison sentence in harsh conditions of confinement half-the-world away from his family and friends, and subsequent deportation to Bolivia – is sufficient punishment to achieve general deterrence.

Notably, in advocating for a longer sentence than the one recommended by the Department of Probation, the government entirely ignores in the Opp, Letter the conditions of his confinement in Panama City, MCC, and MDC. The government's silence on the matter is an admission that, for Mr. Vasquez-Drew, 60 months in prison in the United States will be the psychological and emotional equivalent of a far longer term. *See generally* 8/20 Letter (Background, The Harsh Conditions of His Confinement). Among other things, Mr. Vasquez-Drew's time in prison will be spent (i) far from home; (ii) without visits from family or friends; (iii) without phone calls from family, which are too expensive; (iv) without financial support;

---

https://wwwnc.cdc.gov/travel/notices/warning/coronavirus-bolivia. On August 6, 2020, The State Department issued a Level 4 Warning regarding Bolivia which states: "Do not travel to Bolivia due to COVID-19. Exercise increased caution in Bolivia due to civil unrest." https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Bolivia.html.

[4] The government cites *United States v. Romero*, 749 Fed. App'x 31 (2d Cir. 2018) in support of its position that the Court may use the political situation in Bolivia, and the Bolivian government's antagonism toward the DEA, as a factor in determining Mr. Vasquez-Drew's sentence. The defendant in *Romero*, however, was the son of a President of Honduras who used his political position and clout to help the Honduran drug trafficking organization known as the "Cachiros" smuggle hundreds of kilograms of cocaine bound for the United States through Honduras. *Id.* at 32. Under those unique circumstances – which do not apply here – it was within the District Court's discretion to impose a sentence "reflecting the need to deter government officials from using their positions of power to facilitate drug trafficking." *Id.* at 35. Vasquez-Drew, however, is a private citizen with no political standing in Bolivia and should not be treated like the high-ranking government official in *Romero*.

Honorable Denise L. Cote                                               September 3, 2020
Judge, United States District Court                                              Page 7

and (v) subject to the lockdowns and deteriorating conditions at the MCC and MDC that has effectively confined him to his cell and deprived him of human contact and basic prison services. *Id.* Gone, for now and for the foreseeable future, are the phone calls, exercise, hot food, showers and hygiene, and support programs, that served to ameliorate prison life to some extent. *Id.* Given all this, Mr. Vasquez-Drew's time at the MCC/MDC has been, and will be, far more punitive than the equivalent time for other prisoners facing more usual circumstances. These uniquely harsh confinement conditions further support sentencing Mr. Vasquez-Drew to the recommended non-guidelines sentence of 60 months in prison.

The Department of Probation carefully examined all the 3553(a) sentencing factors, including the seriousness of the offense, and Mr. Vasquez-Drew's role in it, before recommending a non-guideline 60 months sentence. Probation stated:

> Vasquez-Drew lacks a criminal history record, has young children who can benefit from his presence, and has an ailing mother whom he was assisting prior to his arrest. Therefore, we believe that a non-guideline sentence of 60 months' imprisonment, pursuant to 18 USC 3553(a), is sufficient, but not greater than necessary to achieve the sentencing objectives of punishment, incapacitation, and general and specific deterrence.

PSR at p. 16. The Government's Opp. Letter provides no persuasive grounds for the Court to reject Probation's reasoning or its recommendation. The Court should sentence Mr. Vasquez-Drew to 60 months in prison.

## II. THE GOVERNMENT'S REQUEST FOR $45,000 IN FORFEITURE AND $35,000 TO $10 MILLION IN FINES SHOULD BE REJECTED BY THE COURT

The Court should deny the government's request that Mr. Vasquez-Drew be required to forfeit the $45,000 paid by the CSes to the conspiracy pursuant to 21 U.S.C. § 853. Opp. Letter at 12.

"[T]he Government must prove the amount of proceeds relevant to forfeiture by a preponderance of the evidence." *United States v. Lobo*, 15 Cr. 174 (LGS), 2017 U.S. Dist. LEXIS 102106, *4 (S.D.N.Y. June 30, 2017); *United States v. Roberts,* 660 F.3d 149, 165 (2d Cir. 2011) (same). The government does not meet its burden here. At most, the amount forfeited should be $15,000.

In *Honeycutt v. United States*, 137 S.Ct. 1626 (2017), the Supreme Court held that the statutory language and legislative history of 21 U.S.C. § 853 limited forfeiture under that statute to "tainted property; that is, property flowing from, or used in, the crime itself" (137 S.Ct. at 1632) that had been "personally possess[ed] or use[d]" by the defendant (*id.* at 1632). In other words, a defendant may not be held "jointly and severally liable for property that his co-conspirator derived from the crime but that the defendant himself did not acquire." *Id.* at 1630. Here, the government concedes that while "CS-1 handed the defendant $15,000 in connection with the first, attempted cocaine sample" the $30,000 paid in connection with the second, completed sample was paid to "Victor in Manhattan." Opp. Letter at 12. That $20,000, having

been paid to Victor and not Vasquez-Drew, was not personally obtained or acquired by Mr. Vasquez-Drew and may not be part of his forfeiture liability. *Honeycutt, supra*. While the government baldly speculates, sans evidence, that the money may have been "laundered" to Vasquez-Drew at some later date (Opp. Letter at 5), or that Victor calling Vasquez-Drew to confirm Victor's receipt of the monies from CS-1 somehow matters (*id.* at 12), these speculations are merely transparent attempts to achieve what *Honeycutt* expressly forbids – to impose joint and several forfeiture liability on Vasquez-Drew pursuant to § 853, and hold him responsible for the entire $45,000 netted by the conspiracy regardless of how much tainted money was acquired or obtained personally by him. *See also Lobo*, 2017 U.S. Dist. LEXIS 102106, at *23 (where no witness testified Defendant actually received the $60,000 in kickbacks, government did not prove by a preponderance of the evidence that those monies were subject to forfeiture under 21 U.S.C. §§ 853(a), 970).

Likewise, the Court should deny the government's request that Mr. Vasquez-Drew be fined "within the stipulated Guidelines range of $35,000 and $10 million." Opp. Letter at 12-13.

Mr. Vasquez-Drew should not be required to pay a fine because he is financially unable to pay it. "[T]he fact that [Mr. Vasquez-Drew is represented by or has been found eligible for appointed counsel certainly strongly suggests an inability to pay a fine." *United States v. Fields*, 113 F.3d 313, 325-26 (2d Cir. 1997). This strong evidence of inability is buttressed by the modest lower-middle class life of Mr. Vasquez-Drew in Bolivia, which included his inability even to afford to travel to Panama when asked to do so by CSes. 8/20 Letter at 5.

While the government faults Mr. Vasquez-Drew for not providing financial information to Probation, including the "salary" from his livestock business (Opp. Letter at 13), this was not willful obfuscation. Rather, counsel was unable to obtain financial information from Bolivia as there is no book-keeping of salaries made for the sale of cattle in Bolivia and the money from Mr. Vasquez-Drew's livestock business cannot readily or accurately be quantified into a monthly "salary" number, as the government demands. Mr. Vasquez-Drew's livestock business involved fattening other people's animals and getting paid a negotiated commission based on how much weight each animal gained between the time of consignment and slaughter. Over time, Mr. Vasquez-Drew was able to pool that money and buy approximately 30 head of cattle intended for eventual sale. This livestock business allowed him to support himself and, by doing without, provide some help to his family and nursing support to his aged and ailing mother (*see* 8/20 Letter at 2-4), but did not leave him financially able to save money, accumulate assets, or pay the fine requested by the government.

## **CONCLUSION**

For the reasons stated herein and in Mr. Vasquez-Drew's 8/20 Letter, a guidelines sentence in this case (135-168 months in prison) contradicts the parsimony principle guiding federal sentencing. Instead, the Court should sentence Mr. Vasquez-Drew to the 60 months in prison recommended by the Department of Probation. Once he has completed that sentence, Mr. Vasquez-Drew will remain incarcerated until Bolivia reopens its borders and he can be deported back to his native country of Bolivia.

I thank the Court for its continued attention to this matter during these unusual times.

Honorable Denise L. Cote  September 3, 2020
Judge, United States District Court  Page 9

                                        Respectfully submitted,

                                        /s/Sabrina P. Shroff
                                        Counsel for Mr. Vasquez-Drew

SPS/hls

cc: All counsel of record